```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

**DANIEL J. BECKA & LAW OFFICES**
**of DANIEL J. BECKA, LLC,**

        **Plaintiffs,**        Case No. 14 C 8279

        v.        Judge Harry D. Leinenweber

**CHRISTOPHER H. DIETERICH,**

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

At issue is whether two retainer agreements that refer to all represented parties as the "Clients" impose joint and several liability on one individual client, Defendant Christopher H. Dieterich ("Dieterich"). From 2012 to 2014, Plaintiffs Daniel J. Becka and the Law Offices of Daniel J. Becka, LLC (collectively, "Becka") represented Dieterich, along with several other clients, pursuant to two such agreements, the "DGRP Agreement" and the "Superkite Agreement." On October 22, 2014, in an effort to recover unpaid attorneys' fees, Becka filed a Complaint against Dieterich alleging breach of contract. Becka moved for summary judgment on January 20, 2015, prompting Dieterich to file a counter-motion for partial summary judgment on the DGRP Agreement only. For the reasons stated herein, Becka's Motion [ECF No. 8] is granted, but only to the extent it seeks to impose joint and several liability among the "Clients" specifically identified in

the retainer agreements.  Dieterich's Counter-Motion [ECF No. 18] is denied.

## I. BACKGROUND

The Court has derived the following information from the Parties' Local Rule 56.1 statements.  Daniel J. Becka, a citizen of Illinois, is a licensed attorney, and the sole member of the Law Offices of Daniel J. Becka, LLC.  Christopher H. Dieterich, a California citizen, is also a licensed attorney.

On December 24, 2011, Dieterich, along with Robert Masud, Andrew Bacik, Hayman Private Equity LLC ("HPE"), and Masud & Company, hired Becka to represent them in an action in the Circuit Court of Cook County, Illinois, captioned *DGRP Management, LLC et al. v. Roland Husner, et al.,* No. 11 L 2740 (the "DGRP Action").  Dieterich, Masud, Bacik, and the two corporate entities executed a two-page Retainer Agreement with Becka.  The Agreement begins by defining all five parties as the "Clients," and provides that:

> Clients hereby retain Law Firm to provide legal services in connection with the Litigation, which may include, in addition to the defense of the claims asserted by the plaintiffs, the investigation, filing and prosecution of affirmative claims against one or more of the plaintiffs, or others.
>
> Clients will pay Law Firm for the legal services provided at Daniel J. Becka's hourly rate of $450 . . ..  In addition to the hourly fees, Clients agree to be responsible for the payment of all out-of-pocket expenses and costs related to Law Firm's representation of Clients . . ..

(DGRP Agreement, Ex. 1 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.) The DGRP Retainer Agreement makes no mention of how fees or costs are to be apportioned among the "Clients."

Pursuant to the Agreement, Becka represented the clients in the DGRP Action. As a result of Becka's efforts, Dieterich, Masud, and Bacik were dismissed from the action on April 10, 2012 for lack of personal jurisdiction. Through May of 2012, the first five invoices that Becka sent the clients were paid. Becka secured summary judgment on the remaining claims against HPE and ultimately obtained a $5,000,000 judgment on a defamation counterclaim in HPE's favor. By that point, Becka had sent fifteen additional invoices. A balance of $69,634.21 remains outstanding.

On February 18, 2013, Dieterich, Masud, Bacik, and HPE hired Becka to represent them in an action in the Northern District of Illinois, captioned *Superkite Pty Limited. v. Ross Glickman, et al.,* No. 12 C 7754 (the "Superkite Action"). Like the DGRP Agreement, the Superkite Agreement begins by defining all four parties as the "Clients," and provides that:

> Clients hereby retain Law Firm to provide legal services in connection with the Superkite Litigation, and Law Firm agrees to provide such services, under the same terms and conditions as contained in the [DGRP Agreement] . . ..

(Superkite Agreement, Ex. 2 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.) The Superkite Agreement does not state whether or how fees are to be apportioned among the "Clients."

Becka states that an additional party, Hayman Private Equity Australia Pty Ltd. ("HPE Australia") was later added to the Superkite Agreement, a fact that Dieterich disputes. There is only one piece of evidence supporting the addition of HPE Australia to the Superkite Agreement as a fifth party — a March 7, 2013 email exchange between Becka and Dieterich. Becka asks Dieterich, Masud, and Bacik whether they foresee any potential conflict in Becka's representation of HPE Australia, and indicates that if there are no conflicts, he will enter an appearance on behalf of HPE Australia. Dieterich responds: "I have no objection to your representation of the 3 individuals, [HPE], and [HPE] Australia . . .." (Ex. 3 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.)

Upon executing the Superkite Agreement, Becka represented Dieterich, Masud, Bacik, HPE, and HPE Australia, and sent them twelve invoices reflecting the fees and costs incurred in connection with the Superkite Action. Although the clients made payments totaling $55,382.19, a balance of $119,598.03 remains outstanding. On April 15, 2014, Becka withdrew from representing HPE Australia. On October 21, 2014, Becka withdrew from representing Dieterich and the remaining clients because of unpaid attorneys' fees.

Dieterich attests that he was informed by Roland Bleyer, the owner of HPE, that Bleyer had personally guaranteed payment of the remaining attorneys' fees in both cases. (Dieterich Decl., ECF No. 20, ¶ 5; Ex. 6 to Dieterich Decl., ECF No. 20; Ex. 5 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.) The unpaid balance under both retainer agreements is $189,232.24.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those that affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party may meet its burden by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If the moving party satisfies its initial burden, the non-moving party must demonstrate with evidence "that a triable issue of fact remains on issues for which [it] bears the burden of proof." *Knight v. Wiseman,* 590 F.3d 458, 463–64 (7th Cir. 2009).

The judge's role at summary judgment is not to make credibility determinations or weigh the evidence. *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007). In determining

whether a genuine issue of material fact exists, the Court construes all evidence in the light most favorable to the nonmoving party. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000). Because contract interpretation is a question of law, contract cases are often "prime candidates for summary judgment." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir.) *cert. denied,* 135 S.Ct. 280 (2014), *reh'g denied,* 135 S.Ct. 747 (2014).

### III. ANALYSIS

The Court begins by noting that the key facts supporting Becka's breach of contract claim are largely undisputed. In diversity cases such as this one, courts apply federal procedural and state substantive law. *Hanover,* 751 F.3d at 792. Under Illinois law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001). Dieterich does not dispute that he entered into the retainer agreements with Becka, that Becka performed, and that a balance of $189,232.24 remains outstanding. (Def.'s Resp. to Pl.'s L.R. 56.1 Stmt., ECF No. 17, ¶¶ 6–7, 9, 14, 18, 20.) The only contested issue — whether Dieterich is liable for breach of the retainer agreements under a

theory of joint and several liability — is a matter of contract interpretation.

### A. "Clients"

The Court's first task is to determine which persons and entities are encompassed by the term "Clients," as it used in the Retainer Agreements. In interpreting a contract under Illinois law, "the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon,* 948 N.E.2d 39, 47 (Ill. 2011). Illinois follows the "four corners rule" of contract interpretation, in which a written agreement itself is "presumed to speak the intention of the parties who signed it." *Air Safety, Inc. v. Teachers Realty Corp.,* 706 N.E.2d 882, 884 (Ill. 1999) (citation and internal quotations omitted). "In applying this rule, the court looks to the language of the contract alone." *Id.* The contract must be construed as a whole, reading each term or clause in light of the others. *Thompson,* 948 N.E.2d at 47. Clear and unambiguous terms are given their plain and ordinary meaning. *Id.* Courts will enforce unambiguous contracts as written, "without resorting to extrinsic evidence." *Curia v. Nelson,* 587 F.3d 824, 829 (7th Cir. 2009) (applying Illinois law). However, if the contract is ambiguous and subject to more than one reasonable interpretation, the court may consider extrinsic evidence to determine the parties' intent. *Thompson,* 948 N.E.2d at 47.

Both the DGRP Agreement and the Superkite Agreement define the term "Clients" in the first paragraph. The DGRP Agreement is addressed to Dieterich, Masud, and Bacik. It begins by defining the three individuals, as well as HPE and Masud & Company, as the "Hayman Defendants." It then states that, "This letter shall constitute the Retention Agreement between Law Firm and the Hayman Defendants ('Clients')." Thereafter, the Agreement only uses the term "Clients," stipulating that "Clients hereby retain the Law Firm to provide legal services in connection with the litigation," and that "Clients will pay Law Firm for legal services" and related expenses and costs. (DGRP Agreement, Ex. 1 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.)

The Superkite Agreement is likewise addressed to Dieterich, Masud, and Bacik. Similarly, it defines each individual, as well as HPE, as the "Hayman Defendants," and then states that, "This letter shall constitute the Retention Agreement between Law Firm and the Hayman Defendants ('Clients')." Thereafter, the Agreement only uses the term "Clients," and provides that the Clients agree to retain Becka under the same terms and conditions as the DGRP Agreement. (Superkite Agreement, Ex. 2 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.)

There is nothing unclear about the term "Clients," a term that each retainer agreement defines precisely in its opening paragraph. Once introduced, the term is used consistently

throughout the Agreements, and individual client names do not appear again until the signature page.  Dieterich argues that the term "Clients" is ambiguous because "[e]ach defendant, when reading that word, is entitled to think that he, she or it is 'a' client, but . . . not ALL Clients."  (Def.s' Opp., ECF No. 15, at 7.)  The Court does not find this interpretation reasonable, however.  Where the term "Clients" is clearly defined at the beginning of each Retainer Agreement to include all represented parties, the Court cannot conclude that each individual party is "entitled" to believe that "Clients" means anything less than this.  Because only one reasonable interpretation of the term "Clients" is possible, the Court finds the Retainer Agreements unambiguous.

Before addressing the issue of joint and several liability, the Court must assess whether HPE Australia is also a party to the Superkite Agreement.  The only evidence Becka has presented in support of this contention are the March 7, 2013 emails between him and Dieterich.  The two emails make no mention of attorneys' fees or of a Retainer Agreement of any kind.  Indeed, the purpose of Becka's email appears to be to ensure that Dieterich, Masud, and Bacik have no conflict of interest with HPE Australia, not to add HPE Australia to the existing Retainer Agreement.  (*See,* Ex. 3 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1 ("Based on your (next) representations that *you don't* see a conflict by me representing

this entity as well as the other four listed above, I will also appear on its behalf.").) Dieterich's three-line response indicates he has no objection to, or conflict with, the proposed representation. (*See, id.*) In opposition to Becka's Motion, Dieterich attests that he "only approved of Becka and his firm representing an additional defendant, [HPE] Australia . . . as related to a potential conflict of interest between my interests and their interests," not with respect to fees. (Dieterich Decl., ECF No. 20, ¶ 5.) The Court finds Dieterich's interpretation of the emails consistent with their actual language. As a matter of law, the emails fail to demonstrate the addition of HPE Australia to the Superkite Agreement.

### B. Joint and Several Liability

Having found the Retainer Agreements to be unambiguous, the Court now turns to the issue of whether they impose joint and several liability among the "Clients." Under Illinois law, joint obligations under a contract are generally held to be joint and several. *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1283 (Ill. App. Ct. 2002). "A joint obligation for the purposes of joint and several liability is created by a promise of a joint performance or by providing joint consideration." *In re Emerald Casino, Inc.*, No. 02 B 22977, 2014 WL 4954453, at *118 (N.D. Ill. Sept. 30, 2014) (applying Illinois law). "Whether a contractual obligation is joint and several, or only several,

depends upon the intentions of the parties, as revealed by the language of the contract and the subject matter to which it relates." *Brokerage Res., Inc. v. Jordan,* 400 N.E.2d 77, 80 (Ill. App. Ct. 1980).

"Parties to a contract are more likely to have a joint and several contractual obligation if they have a joint or identical interest in the contract or its subject matter, instead of diverse interests." *Id.* For example, in *Pritchett,* a plaintiff who had entered into a settlement agreement with multiple defendants in an asbestos case sought to collect unpaid portions of the settlement amount. *Pritchett,* 773 N.E.2d at 1279–81. The Illinois Appellate Court affirmed the lower court's imposition of joint and several liability against all defendants "in the absence of any language restricting the defendants' liability to several." *Id.* at 1284.

The Court looks to both the language of the Retainer Agreements and the interests of Dieterich and the other clients to determine whether joint and several liability applies. Here, the language of the Retainer Agreements reflects a joint promise among "Clients" to pay Becka all legal fees incurred in the two actions. The Agreements never provided that fees and costs were to be divided among the "Clients," nor did they limit any individual client's liability to a portion of the total fees incurred. As in *Pritchett,* there is no language restricting the clients' liability. *Id.* The invoices that Becka sent to Dieterich and the

other clients reflect this lack of apportionment — they group together all fees incurred in each action without any distinction between clients. (*See,* Ex. 5 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.)

Dieterich argues that he did not share the same interests as the other clients Becka represented. According to Dieterich, the DGRP and Superkite Actions involved "multiple and divergent activities and several different parties, each with differing situations and possible outcomes." (Def.'s Opp., ECF No. 15, at 8.) With respect to the DGRP Action, Dieterich advances two additional arguments. First, he argues that joint and several liability is inconsistent with the Illinois Rules of Professional Conduct. Dieterich notes that Rule 1.7, and the ABA Model Rule on which it is based, indicate that individual clients "must be treated uniquely and separately." (Def.s' Opp., ECF No. 15, at 8.) Rule 1.7 also provides that, absent informed consent, "a lawyer shall not represent a client if the representation of one client will be directly adverse to another client." Ill. R. Prof'l. Conduct 1.7. Dieterich states that after his dismissal, his interests were adverse to HPE, the remaining defendant in the DGRP action, because he was "alleged to be responsible for that 'client's' fees and yet . . . [had] no beneficial interest in the outcome of the case." (Def.s' Opp., ECF No. 15, at 5.)

Dieterich's second argument against joint and several liability in the DGRP action appears in his counter-motion. There, Dieterich argues that joint and several liability is not appropriate because, after his dismissal, any promise to pay for legal services on behalf of HPE would have to have been made in writing under the Illinois Frauds Act, 740 ILCS 80/1.

The Court finds both of Dieterich's arguments unavailing. As to Dieterich's first argument, even if Dieterich and HPE's interests in the DGRP action diverged after his dismissal, they were closely related when Dieterich and HPE, both named defendants, retained Becka as counsel under a single Retainer Agreement. Although neither party provides much detail about the underlying lawsuit, a news article included as an exhibit to Becka's Rule 56.1 Statement indicates the clients' interests were interrelated. For example, HPE's counterclaim for defamation involved the attribution of certain false statements to all of the clients named in the DGRP Agreement, including Dieterich. (Ex. 4 to Pls.' L.R. 56.1 Stmt., ECF No. 10-1.) For this reason, the Court finds that Dieterich had a joint interest with HPE and the other clients in retaining Becka pursuant to the Agreement. As to Dieterich's Frauds Act argument, no separate writing was necessary to guarantee Dieterich's payment because that obligation was already evident on the face of the DGRP Agreement.

Because the Retainer Agreements are drafted in a way that reflects a joint promise to pay among all "Clients" — an unambiguous term that includes Dieterich — and because Dieterich and the other clients shared a joint interest in Becka's representation, the Court finds the imposition of joint and several liability appropriate. However, because Becka has not established that HPE Australia is a party to the Superkite Agreement, joint and several liability only exists among the "Clients" specifically identified in the Retainer Agreements.

## IV. CONCLUSION

For the reasons stated herein, Becka's Motion for Summary Judgment [ECF No. 8] is granted to the extent that it seeks to impose joint and several liability among the "Clients" identified in the Retainer Agreements. Dieterich's Counter-Motion for Partial Summary Judgment as to the DGRP Agreement [ECF No. 18] is denied.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: 4/24/2015